MARVIN, Chief Judge.
In this medical malpractice claim the trial court, finding that plaintiff discovered or should have discovered the facts upon which her cause of action was based more than one year before she brought the claim, granted the hospital’s motion to dissolve the medical review panel invoked by plaintiff in April 1991 to review her claim of malpractice that allegedly occurred when she underwent a surgical hysterectomy in October 1989. LRS 9:5628; 40:1299.-47B(2).
Plaintiff contends that she only learned of the alleged malpractice within a year of bringing the claim.
As in liberative prescription questions where the doctrine of contra non valen-tem is urged, the issue is essentially factual: When was the malpractice reasonably knowable to plaintiff?
Finding no clear error in the trial court’s resolution of the issue, we affirm.
FACTS
Plaintiff, Carolyn Sigler, relates regaining consciousness after undergoing a vaginal hysterectomy at the LSU Medical Center in Shreveport on October 27, 1989, and experiencing an “explosive” pain in her left calf. She asked the recovery room nurse to “do something ... [because] my leg is killing me.” Thereafter Ms. Sigler went to sleep and was later moved to a regular room. Awaking there, she found that her left leg was numb and she could not move it. The pain returned within a day or so. She then found that she could move her leg but could not support herself without assistance. She used a walker for support while she was in the hospital and for several weeks after she was discharged on November 1, 1989.
Ms. Sigler had had no problems with her leg before the surgery. While in the hospital, she reported her leg pain and numbness to Dr. Bordelon, the surgeon who performed the hysterectomy. She said Dr. Bordelon told her that “it had something to do with the nerves, but that it was normal for that to be like that with that type of surgery [and] ... it all goes away ... usually in two weeks.” According to Ms. Sigler, Dr. Bordelon did not tell her that leg pain and numbness were among the “normal” risks of the surgery when he obtained her written consent to the surgery.
Ms. Sigler returned to LSUMC for scheduled follow-up appointments with the neurology clinic and the obstetrics/gynecology clinic in late November 1989, about four weeks after the surgery. Her leg was still painful and sometimes “gave way” when she walked. She no longer used the walker but usually had someone accompany her and provide support when she walked or used stairs away from her home.
Dr. Husain saw Ms. Bigler at the neurology clinic November 27, 1989. She said Dr. Husain told her that she had “some femoral nerve damage ... during the surgery ... but that it should ... get better.” Dr. Husain did not tell Ms. Sigler when to expect the improvement or ask her to return for further evaluation.
At about the same time, Ms. Sigler was seen in the ob/gyn clinic by a doctor other than Dr. Bordelon, whose name does not appear in the record. This doctor told Ms. Sigler that he was seeing her “because of [the] problem you’re having ... with [your] leg.” Ms. Sigler said he tested her leg reflexes with a small hammer and told her that “it should get better,” without giving her a time frame. Ms. Sigler had no other complications from the hysterectomy and was discharged from care by the ob/gyn doctor in late November 1989, with the restriction that she could not perform work *745 that required her to stand or walk for an extended period.
Before the surgery, Ms. Sigler worked as a cook and cashier at a restaurant and tackle store in her home parish of Sabine. Her employer would not allow her to return to work because of her medical restrictions. Ms. Sigler said she then contemplated filing a claim for social security disability benefits until she could return to work.
In December 1989, Ms. Sigler accompanied her daughter, Debbie Lee, to the office of C. Rodney Harrington, a Natchitoches attorney who was handling Ms. Lee’s accident claim. Ms. Sigler remained in Harrington’s waiting room. Relating to Harrington the problems Ms. Sigler had had with her leg since the surgery at LSUMC, Ms. Lee asked him about handling a social security claim. Faced with an appointment to see another client, Harrington spoke to Ms. Sigler only briefly, instructing his secretary to order Ms. Sigler’s medical records from LSUMC and to arrange for Ms. Sigler to be evaluated by another doctor to “set the wheels in motion for the social security claim.” Harrington asserts in his affidavit that he “was not ... looking into any malpractice claims” for Ms. Sigler at this time.
Harrington arranged for Ms. Sigler to see an Alexandria neurosurgeon, Dr. Drer-up, on December 20, 1989. Dr. Drerup’s letter of January 3, 1990, and his report to Harrington summarize the history Ms. Si-gler gave him and the findings he made during his December examination:
[Ms. Sigler] has subtle findings of hypo-tonia in the left quadriceps muscle, poorly defined and poorly reproduceable sensory changes of the left lower extremity, asymmetry of the quadriceps muscles (left being smaller than right) and an absent patella reflex on the left side. According to the patient’s statements, the motor dysfunction is improving. She states following a vaginal hysterectomy performed under general anesthesia, she was unable to move her left lower extremity. She states she was diagnosed with femoral nerve damage. Her physical examination today would indicate changes occurring in the quadriceps muscle. The etiology may be musculogenic vs. neurogenic. Because she gradually is improving, I have suggested she continue this conservative approach.
Dr. Drerup opined that Ms. Sigler’s problems may have been muscular rather than neurological in origin, but did not perform tests to confirm or rule out femoral nerve damage. Dr. Drerup did not diagnose the cause of Ms. Sigler’s condition or make a prognosis for her return to work.
Ms. Sigler testified that Dr. Drerup told her during her visit that “he never heard of what I was trying to tell him.... He’d never heard of anybody having ... femoral nerve damage ... from [a hysterectomy].” She said Dr. Drerup also told her that he, being a neurosurgeon, “wasn’t the type of doctor I needed to go to ... [because] surgery wouldn’t do it no good.”
We emphasize that on or about December 27, 1989, a week after Ms. Sigler saw Dr. Drerup, Harrington wrote to LSUMC:
This is to advise you that we have been retained by Ms. Carolyn Sigler to represent her in a claim for damages sustained while she was undergoing surgery at LSU Medical Center.
Please forward to me all of Ms. Sigler’s medical information concerning her stay at LSU beginning October 27, 1989 through the present. Enclosed is an authorization signed by Ms. Sigler.
Relying on the circumstances we have summarized above, LSUMC contends that prescription on Ms. Sigler’s malpractice claim began running no later than December 27, 1989, because she and her attorney, Harrington, then had constructive knowledge of “her claim for damages sustained while she was undergoing surgery at LSUMC,” as the letter states.
Ms. Sigler’s response to LSUMC’s argument was Harrington’s affidavit, stating that his secretary drafted the letter and signed his name to it without his having reviewed it, and that the reference to his representing Ms. Sigler in “a claim for damages sustained while she was undergoing surgery at LSU Medical Center” is *746 “insignificant” and is “our standard [language in a] request for medical records.”
Harrington and Ms. Sigler each assert that they first suspected that an act of malpractice may have been committed only after Harrington received and reviewed Ms. Sigler’s LSUMC medical records in May 1990, or within the one year before Ms. Sigler filed her claim with the commissioner of administration in April 1991.
The litigants offered differing explanations for the five-month delay between Harrington’s request for and his receipt of the records. According to stipulated testimony by the LSUMC records custodian, Harrington was notified by letter on January 3, 1990, that the records would not be sent until LSUMC received payment for them. Harrington again requested the records, without enclosing payment therefor, on March 26, 1990. LSUMC received payment for Ms. Sigler’s records and sent them to Harrington on May 23, 1990.
Harrington testified that his office never received the “prepayment” letter from LSUMC and that he was first informed of the need to advance $50 for the records when he personally went to the LSUMC records department on May 22, 1990, while in Shreveport on other business. His secretary apparently made the payment the next day.
Harrington’s affidavit states:
When I reviewed the records, a couple of days [after May 23, 1990], I was puzzled by the fact that [they] referred in many instances to the “femoral nerve damage” [as] a direct result of the surgery, but that it was the doctor’s feelings that it was something that should resolve itself fairly quickly.
I called and asked a friend who is a nurse anesthetist and another friend who is a general practitioner what they thought about it,’ and both of them advised me that they thought that some malpractice may have existed on the part of LSU Medical Center.0
I then contacted Ms. [Sigler], advised her of my findings, and we subsequently filed a malpractice claim against the LSU Medical Center.
Ms. Sigler’s LSUMC medical records were not introduced in evidence.
Ms. Sigler said she first suspected the LSUMC “doctors had done something wrong with regard to [her] treatment” when Harrington telephoned in May or June 1990, telling her, “I got your records and ... we might be on to something and I talked to some people myself and they ... never heard of this happening; ... staying on [and not getting better].”
Ms. Sigler said she never discussed the possibility that she had been improperly treated at LSUMC either with Dr. Drerup, the Alexandria neurosurgeon, or with other doctors she saw (a family doctor and a neuropsychologist) after she filed her social security claim in 1990.
LAW
The litigants do not dispute that a medical malpractice claim must be filed within one year from the date when the plaintiff discovered or should have discovered the facts upon which her cause of action is based. LRS 9:5628; Griffin v. Kinberger, 507 So.2d 821 (La.1987).
A plaintiff’s awareness that an undesirable condition developed after her medical treatment does not, of itself, commence the running of prescription, as long as it was reasonable for her not to recognize that the condition ,may have been caused by improper treatment. Griffin, supra; Cordova v. Hartford Acc. & Indent. Co., 387 So.2d 574 (La.1980).
When a plaintiff has actual or constructive knowledge of facts strongly suggesting that the untoward condition may be the result of improper treatment and there is no effort by the health care providers to mislead or cover up information, which is available to plaintiff either through inquiry or professional medical or legal advice, then the facts and cause of action are deemed reasonably knowable to the plaintiff. In such circumstances, a plaintiff’s failure to bring the claim within the one-year period thereafter is not reasonable. Maung-U v. May, 556 So.2d 221 (La.App. 2d Cir.1990), writ denied.
*747 Applying these legal principles, the trial court found that LSUMC’s motion to dissolve the medical review panel on the grounds of prescription “has merit and the applicable law is in favor of the motion.” While no detailed reasons were given, the trial court implicitly found that Ms. Sigler’s cause of action was reasonably knowable to her before May 1990, when her attorney received the medical records from LSUMC, notwithstanding the explanations offered by her and her attorney that she had no reason to suspect malpractice before May 23, 1990.
We give the same deference to the trial court’s credibility assessments and factual findings, whether express or implicit, when the evidence is presented by written documents (here, Ms. Sigler’s deposition, Harrington’s affidavit and the stipulation as to the testimony of the LSUMC records custodian) as we do when the trial court hears and sees the witnesses testify. Virgil v. American Guar. & Liability Ins., 507 So.2d 825 (La.1987).
REVIEW
Ms. Sigler had no problems with her leg before the October 1989 hysterectomy. She had severe pain, numbness and temporary immobility of the leg immediately after the surgery. She said these symptoms were not among the risks of the hysterectomy that Dr. Bordelon disclosed to her when she consented to the surgery. We agree that from Dr. Bordelon’s initial post-surgery assertion to her that her symptoms were a “normal” result of the surgery and usually resolved in two weeks, Ms. Sigler could have reasonably inferred for a month after her surgery that malpractice had not occurred.
The reasonableness of her reliance diminished, however, as her symptoms persisted with only slight improvement after she saw the LSUMC doctors a month after the surgery.
According to Ms. Sigler, some four weeks after the surgery, the LSUMC neurologist, Dr. Husain, told Ms. Sigler that she had suffered “femoral nerve damage during the surgery.” Dr. Husain did not give, and Ms. Sigler apparently did not ask for, a prognosis about the leg pain and numbness or its duration. She did not return for further follow-up evaluations at the neurology clinic. Ms. Sigler also saw an ob/gyn doctor about a month after the surgery.
Ms. Sigler said she did not ask Dr. Hu-sain, Dr. Drerup or any other doctor she saw after the surgery whether her condition could have been the result of improper medical treatment rather than a “normal” risk of the surgery, as Dr. Bordelon had told her.
Ms. Sigler effectively told Dr. Drer-up on December 20, 1989, that “following [her] hysterectomy ... [and being] unable to move her left [leg] she was diagnosed with femoral nerve damage.” She apparently also related to Dr. Drerup what LSUMC doctors told her a month after the surgery about the nerve damage being a “normal” result of such surgery. Ms. Si-gler said Dr. Drerup told her in December that he “had never heard of what I was trying to tell him,” that is, that femoral nerve damage could be a “normal” risk of a hysterectomy.
Thus, even if we should assume for discussion purposes that it was reasonable for Ms. Sigler not to have recognized or suspected that her leg condition may have resulted from improper treatment during the October surgery before she saw Dr. Drerup, the assumption cannot continue after she was examined by and discussed her leg condition with Dr. Drerup on December 20, 1989.
What Attorney Harrington asserts that he “discovered” only after reviewing the medical records he received from LSUMC in May 1990 — that Ms. Sigler suffered femoral nerve damage during the surgery and that the doctors expected it to resolve itself fairly quickly — is exactly what Ms. Sigler says she was told by Drs. Bordelon and Husain about a month after the surgery.
We need not resolve why Harrington did not obtain Ms. Sigler’s medical records from LSUMC before May 1990. The reason for the delay is relatively immaterial *748 because the records did not disclose anything about Ms. Sigler’s leg condition that Ms. Sigler did not already know, at least by December 20, 1989 — that is, that after the hysterectomy she had “femoral nerve damage,” a damage that Dr. Drerup did not believe was “normal” and that he “never heard of” occurring after a hysterectomy.
The record simply does not support Ms. Sigler’s assertion that LSUMC’s alleged “delay” in sending Harrington the records further “concealed the truth” from her.
Ms. Sigler told Dr. Drerup on December 20 she had or “was diagnosed with femoral nerve damage” following the surgery. When he responded, according to her, that he had never heard of femoral nerve damage occurring as a normal risk of a hysterectomy, she acquired at that time knowledge of facts that strongly suggest to a reasonable mind that her “femoral nerve damage” may have resulted from improper or negligently performed surgery. This knowledge was sufficient to begin the one-year prescriptive period for filing a malpractice claim, notwithstanding the assertions of Ms. Sigler and Harrington that they did not suspect that malpractice may have occurred until Mr. Harrington received and reviewed the medical records in May 1990. Maung-U v. May, supra.
CONCLUSION; DECREE
The trial court was not clearly wrong in its implicit finding. Ms. Sigler, as any reasonable plaintiff, knew or should have known on December 20, 1989, that her femoral nerve damage may have resulted from improper treatment during the October 1989 surgery. She did not formally assert her claim until April 1991.
The judgment dissolving the medical review panel on the basis of the one-year liberative prescription, at the cost of Ms. Sigler, here and below, is AFFIRMED.